IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 12-cv-00627-LTB

JEANINE CHAVEZ,

        Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.
_____

ORDER
_____

Plaintiff Jeanine Chavez appeals from the Social Security Administration Commissioner's (the "Commissioner"), final decision denying her application for disability insurance benefits, filed pursuant to Title II of the Social Security Act (the "SSA"), 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral arguments will not materially aid in resolving this appeal. After considering the briefs and the administrative record, I REVERSE the Commissioner's final order and REMAND for further proceedings consistent with this order and judgment.

## I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her October 15, 2008, application for disability insurance benefits. [Administrative Record ("AR") 105] The application was initially denied at the administrative level. [AR 105]  An Administrative Law Judge ("ALJ") subsequently conducted an initial hearing on June 2, 2010, and a supplemental hearing on June 15, 2010. He issued a written ruling on September 10, 2010, denying Plaintiff's application on the basis that she was not disabled between the date on which she alleges that she became disabled and the date the ALJ rendered his decision. [AR 8-27]    On January 17, 2011, the Social Security

Administration Appeals Council (the "Appeals Council") denied Plaintiff's administrative request for reconsideration, making the denial final for the purpose of judicial review. [AR 1] Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II. FACTS

Plaintiff was born on June 20, 1960, and was 47 years old on her alleged onset sate. [AR 208, 242] She has a high school education and most recently worked in accounts receivable and IT at a law firm. [AR 243] Plaintiff alleged in her claim for disability benefits that she became disabled on May 1, 2008, due to tendonitis in her hands and arms, pain in her left ankle, and fibromyalgia. [AR 242] She now alleges that the evidence shows she also has a disabling mental impairment, Post-Traumatic Stress Disorder ("PTSD").  Pursuant to 20 C.F.R. § 404.130, in order to be eligible for benefits, Plaintiff must prove that her disability began before the date through which she remained insured, which is December 31, 2012. [AR 11]  The relevant time period for determining disability is therefore May 8, 2008, through December 31, 2012. [AR 11]

Only a selected summary of Plaintiff's medical history is necessary to resolve this motion. Thus, the below should be not viewed as exhaustive. The first component of Plaintiff's medical history is her mental health.  Plaintiff has a long history of mental health issues, which she and her longtime treating psychologist, Dr. Jason Seidel, trace to her allegedly being sexually abused by her grandfather. In 2001, Plaintiff began seeing Dr. Seidel weekly for her various mental issues, including panic attacks, anger, anxiety, and feeling that her life was out of control. [*See, e.g.*, 758-61] Plaintiff has seen Dr. Seidel for treatment regularly since then. [AR 549-690 (treatment records from September 6, 2007, to January 28, 2010), 754-1210 (treatment records from November 6, 2011, to August 30, 2007)] However, only Dr. Seidel's treatment records from 2007-2010 were before the

ALJ when he rendered his decision.

On January 28, 2010, Dr. Seidel completed a Mental Ability Assessment (the "MAA"), to determine Plaintiff's ability to do work-related activities on a daily basis in a regular work setting. [AR 545-48] Dr. Seidel was to complete the MAA based on Plaintiff's medical history, the chronicity of the findings, as well as his estimate of the expected duration of any work-related limitations. [AR 545] Dr. Seidel diagnosed Plaintiff with Dissociative Identity Disorder, which is a personality disorder, and PTSD. [AR 545] He also assigned her a global assessment of functioning ("GAF") of 35. A GAF score is a subjective determination based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." *See* Pl.'s Opening Brief at 4 n.1 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32). A score of 35 indicates "some impairment in reality testing or communication or a major impairment in several areas such as work, family relations, thinking, or mood." *Id.* In the MAA, Dr. Seidel further opined that Plaintiff has numerous marked and extreme limitations with respect to sustained concentration and persistence, understanding and memory, personal/social adjustment, and ability to adapt. [*See* AR 545-48]

The second component of Plaintiff's medical history is her physical health. On January 20, 2009, Plaintiff saw Dr. William Qutub for a physical examination. [*See* AR 514-23] Based on his examination and his review of certain records, he diagnosed Plaintiff with fibromyalgia, left thoracic outlet syndrome with pectoralis minor syndrome, affective disorder, and possible history of hyperthyroidism. [AR 521-22] He also rendered an opinion concerning Plaintiff's functional physical limitations. [AR 522] Among others things, Plaintiff could stand or walk five to six hours in a workday, with increased breaks optimizing her performance, and she could sit for an unlimited

3

amount of time. [AR 522] She could lift 30 to 40 pounds frequently or occasionally, and she could carry 10 to 15 pounds in her right arm frequently. [AR 522] Plaintiff would experience manipulative symptoms in her upper left arm, particularly with pulling or pushing overhead. [AR 522]

Later that year, on June 11, 2009, Dr. Eric Leder completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) on Plaintiff (the "Physical Assessment"). [*See* AR 734-38] Dr. Leder had been Plaintiff's treating general physician since 2004, treating her for, among other things, shoulder, ankle, leg, foot, and back pain, as well as leg swelling [*See* AR 524-35] In the Physical Assessment, Dr. Leder opined that Plaintiff had significant limitations with respect to her lifting and carrying; sitting, standing, and walking; use of right and left hands; and postural activities. [*See* AR 734-38] These limitations were much more sever than those that Dr. Qutub had concluded from his exam. [*Compare* AR 734-38, *with* AR 514-23] Dr. Leder also opined in the Physical Assessment that Plaintiff had the following physical impairments: shoulder impingement, pectoralis minor syndrome, thoracic outlet syndrome, and sciatica. [AR 734]

### III.  LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under the SSA, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether

the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See id.* §§ 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See id.* § 404.1520(g).

As relevant here, a claimant is required to establish that she became disabled prior to the expiration of her insured status. *Id.* § 404.130; *see also Potter v. Sec'y of Health & Human Servs.,* 905 F.2d 1346, 1347-48 (10th Cir. 1990).

### IV. ALJ's RULING

The ALJ found that Plaintiff met the insured status requirements of the SSA through December 31, 2012. [AR 13] He ruled that Plaintiff had not engaged in substantial gainful activity since May 1, 2008, the alleged onset date (Step One). [AR 13] The ALJ also found that Plaintiff had the following severe medical impairments: Dissociative Identity Disorder, left brachial plexus injury, thoracic outlet syndrome, left shoulder bursitis, pectoral minor syndrome, and fibromyalgia (Step

Two). [AR 13] Next, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Step Three) As a result, the ALJ went on to assess Plaintiff's RFC. [AR 14]

The ALJ evaluated the entire record and found that as of the hearing date, Plaintiff had the RFC to perform a range of light word as defined in 20 C.F.R. § 404.1567(b). [AR 14] Specifically, the ALJ concluded that Plaintiff had the following RFC.  Physically, she could occasionally lift or carry 20 pounds and can frequently lift or carry 10 pounds. [AR 14] She could sit for two hours at a time and could sit for at least six hours in an eight-hour workday. [AR 14] Plaintiff could frequently operate foot controls with her right lower extremity and could do so occasionally with her left. [AR 14] She could frequently reach, handle, finger, and feel bilaterally with the following qualification: approximately every 30 to 60 minutes, if using a computer or performing other sustained and repetitive upper extremity tasks, she would need to stop that specific function and go to a different type of work-related task for 10 to 15 minutes. [AR 14] However, Plaintiff should not climb scaffolding or ladders, but she could occasionally climb ramps and stairs and could occasionally stoop, kneel, crouch, and crawl. [AR 14] She could also occasionally drive as a requirement of a job. [AR 14] She could occasionally be exposed to extreme heat or cold, wetness, humidity, vibration, and pulmonary irritants. [AR 14] She should not work with or near dangerous moving machinery or at unprotected heights. [AR 14] Cognitively, Plaintiff had the ability to understand, remember, and carry out the kinds of instructions and procedures that can be learned in 60 to 90 days. [AR 14]  Socially, she could have only occasional work interaction with co-workers and supervisors and could not be required to interact with the public for work. [AR 14-15]

As a result of the RFC assessment, the ALJ found that Plaintiff was unable to perform any of her past relevant work (Step 4). [AR 22] The ALJ therefore proceeded to the fifth and final step.

The ALJ found that significant jobs existed in the national economy for Plaintiff given her age, education, work experience, and RFC (Step 5). [AR 23] These included office helper, mail clerk, and routing clerk. [AR 23] Thus, the ALJ denied Plaintiff's application because she was not disabled as defined by the SSA–from her alleged disability onset date through the date of the hearings–at Step 5 of the sequential evaluation process. [AR 20-21] On review, the Appeals Council "found no reason" to reconsider the ALJ's decision. [AR 1]

## V.  STANDARD OF REVIEW

My review here is limited to whether the final decision is "supported by substantial evidence" in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).  My review of the factual findings is to determine whether they "are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).  "It requires more than a scintilla, but less than a preponderance." *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004).

## VI. APPEAL

### A

Plaintiff raises four issues on appeal. The first is that the ALJ failed to explain what weight,

if any, he assigned to Dr. Seidel's and Dr. Leder's opinions on her mental and physical limitations, respectively, caused by her medical condition. For the reasons below, I agree.

1

The parties do not dispute that Dr. Seidel and Dr. Leder were treating sources. An ALJ should generally give more weight to opinions from a claimant's treating sources. *Id.* at 1300. When assessing how much weight to give a treating source opinion, the ALJ must complete a two step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive–that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. The opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Watkins*, 350 F.3d at 1300 (applying Social Security Ruling 96-2p (hereinafter, "SSR 96-2p"), 1996 WL 374188, at *2); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If both of these conditions are met, the inquiry ends, and the opinion is given controlling weight. *See id.*

If, however, one of these conditions is not satisfied, the ALJ must proceed to the next step because "even if a treating opinion is not given controlling weight, it is still entitled to deference." *Krauser*, 638 F.3d at 1330. At step two, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Id.* If this is not done, remand is mandatory. *Id.* As SSR 96-2p explains,

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record *means only that the opinion is not entitled to " controlling weight," not that the opinion should be rejected*. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§ ] 404.1527 and 416.927. *In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight*.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4). Hence, the absence of a condition for controlling weight raises but does not resolve the second, distinct question of how much weight to give the opinion. *Id.* at 1330-31 (citing *Langley v. Barnhart*, 373 F.3d 1116, 1120 (10th Cir. 2004) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331. In applying these factors, "the ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimately assigns the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Additionally, the notice of decision " 'must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *5). Without these findings, remand is required. *Id.* at

1300, 1301; *accord Krauser*, 638 F.3d at 1330. Lastly, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so. *Watkins*, 350 F.3d at 1301.

**2**

I begin with the ALJ's treatment of Dr. Seidel's opinion. As will become clear, his treatment was predicated on the opinion of an independent medical expert, Dr. Nancy Winfrey, who testified at the supplemental hearing as to Plaintiff's mental impairments. Therefore, in order to contextualize the ALJ's determination, it is necessary to give an overview of her testimony.

For her testimony, Dr. Winfrey reviewed the record, which, at that time, included only Dr. Seidel's MAA and his treatment records from September 2007 to January 2010. She thus did not review the 455 pages of Dr. Seidel's treatments notes from 2001-2007. [*See* 754-1210]

Dr. Winfrey's opinions differed dramatically from Dr. Seidel's opinions. [AR 16-18] In sum, she opined that Plaintiff's only sever impairment was Dissociative Identity Disorder, that this impairment did not meet a listed impairment, and that Plaintiff was much more capable and functional that Dr. Seidel concluded she was. [AR 16-18] She also noted that such conditions as PTSD, obsessive/compulsive disorder, and social phobia, while referenced in Dr. Seidel's treatment notes, found very little support in the record. [AR 16] Dr. Winfrey also reviewed the MAA. She opined that the Plaintiff has no limits on carrying out short, simple, or detailed instructions, or in maintaining concentration, persistence, or pace. [AR 17] She further determined that Plaintiff had mild limits on interacting with the public, co-workers, and supervisors, as well as mild limits in responding to usual work situations and changes. [AR 17] When asked about the 35 GAF score that Dr. Seidel assigned to Plaintiff, Dr. Winfrey stated that she would have given a much higher score based upon the record before her and that the 35 was not supported by that record. [AR 18]

The ALJ asked Dr. Winfrey to explain the stark disparity between Dr. Seidel's opinions and hers. Giving specific examples, she stated that the MAA contained little support for the conclusions therein. [*See* AR 17-18] She also asserted that there were inconsistencies between the MAA and the record. [*See* AR 17-18]

In his decision, after recapitulating Dr. Winfrey's testimony, the ALJ stated the following:

> Overall, with respect to the alleged mental impairment, the undersigned does not find there is reason to delve into the records and treatment notes individually and with specificity. The medical expert in the field of psychology reviewed these records thoroughly and offered her professional opinion; thus, the undersigned adopts the findings of Dr. Winfrey with respect to [Dr. Seidel's conclusions in the MAA], [Dr. Seidel's treatment notes from 2007-2010], the medical Listings for mental impairments, and the paragraph B and C findings.
>
> \*       \*       \*
>
> As for the opinion evidence, the undersigned gives more weight to the opinion of the medical expert in psychology who testified at the hearing. While great weight is typically given to the opinion of a treating source (such as those in Exhibits 18F and 19F), the undersigned accepts the medical expert's discounting of those opinions as lacking adequate support in the record and treatment notes.

[AR 18, 22] Again, like Dr. Winfrey, the record before the ALJ contained only Plaintiff's treatment records from Dr. Seidel dated September 2007 to January 2010. Plaintiff submitted the 2001-2007 records to the Appeals Council as part of her appeal. These two paragraphs are all the ALJ stated concerning the weight he assigned to Dr. Seidel's opinion.

Clearly the ALJ did not accord the opinion controlling weight, but as a treating source, Dr. Seidel's opinion is still entitled to deference and must be weighed. *Krauser*, 638 F.3d at 1330. Yet it is indiscernible whether he accorded the opinion significant weight, some weight, little weight, or rejected it entirely. This is insufficient. *See Watkins*, 350 F.3d at 1301; *Krauser*, 638 F.3d at 1331; *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (concluding that ALJ's decision

was deficient because the ALJ "failed to articulate the weight, if any, he gave Dr. Baca's opinion" and "failed to specify what lesser weight he assigned to Dr. Baca's opinion"). And if he did reject it entirely based on Dr. Winfrey's opinion that Dr. Seidel failed to provide sufficient support for his conclusions, "he should have contacted [Dr. Seidel] for clarification of his opinion before rejecting it." *Robinson*, 366 F.3d at 1084.

The ALJ also did not explain the reasons for weighing the opinion as he did–whatever that weight was. Dr. Winfrey gave *her* reasons for discounting and disputing Dr. Seidel's opinions, and the ALJ recapitulated those when presenting her testimony in his decision. But nowhere did the ALJ provide *his* reasons for according Dr. Seidel's opinion the unstated weight he did. *See Robinson*, 366 F.3d at 1083 ("Because the ALJ failed to provide any explanation of how *he* assessed the weight of the treating physician's opinion, as required by Soc. Sec. R. 96-2p, we cannot simply presume the ALJ applied the correct legal standards in considering Dr. Baca's opinion.") (internal quotations omitted and emphasis added). To be sure, the ALJ is not required to "apply expressly" all the relevant factors when determining the weight of a medical opinion. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Nor must he formulaically articulate a detailed analysis of each factor. *See Qualls*, 206 F.3d at 1372; *see also Branum v. Barnhart*, 385 F.3d 1269, 1275-76 (10th Cir. 2004). It is not clear, however, that the ALJ independently applied any of them. His blanket, conclusory statements summarily adopting Dr. Winfrey's opinions wholesale is not "sufficiently specific to make clear to [me] the weight [he] gave to [Dr. Seidel's] opinion and the reasons for that weight.' " *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *5).

Those statements also do not adequately explain why he gave Dr. Winfrey's opinions controlling weight, including those discounting Dr. Seidel's opinions. "When a treating physician's

12

opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (internal quotations omitted). It is unclear that this is what the ALJ did. The ALJ did not explicate how the fact that Dr. Winfrey was a medical expert in psychology who had reviewed the records thoroughly and offered her professional opinion so drastically differentiated her from Dr. Seidel, who was also an expert in psychology, was asked to based his opinions in the MAA on Plaintiff's medical history, and had offered his professional opinion. [*See* AR 545] The ALJ's explanation is especially lacking considering that Dr. Seidel had been treating Plaintiff regularly for nine years at the time of the ALJ's decision, and Dr. Winfrey was a non-examining, non-treating opinion, which means that, generally, her opinion is entitled to the least amount of weight. *See* 20 C.F.R. §§ 404.1527(c)(1), (2).

**2**

I now turn to the ALJ's treatment of Dr. Leder's opinions in his Physical Assessment. With respect to those opinions, ALJ stated that Dr. Leder

> provided little support in the body of this assessment, besides listing her conditions as including shoulder impingement, sciatica, thoracic outlet syndrome, and pectoralis minor syndrome. He did not draw a relation between the listed conditions and the limitations; for instance in the area for identifying the "medical or clinical findings that support the above assessment" he simply re-listed the conditions without explanation. Dr. Leder further indicated that pain would prevent work activity for the claimant four or more days per month. (Exhibit 25F). The undersigned finds this opinion lacks support–both in the report itself and in the treatment notes from this source.

[AR 21] The ALJ then cited specific examples of what he found to be inconsistencies between Dr. Leder's opinions in the Physical Assessment and his treatments and other evidence of record. [AR

21] The ALJ said nothing else concerning Dr. Leder's opinions, save a passing reference quoted below. For his findings as to Plaintiff's physical impairments, the ALJ relied instead on the opinion of Dr. Qutub. [AR 22] The ALJ gave Dr. Qutub's opinion "great weight," explaining that Dr. Qutub "adequately addressed the claimant's multiple physical complaints and gave a thorough and reasonable functional assessment" and that he "followed up on any ambiguity in the original functional assessment in a later correspondence." [AR 22] "In short," the ALJ concluded, "the opinion of Dr. Qutub contains the most thorough explanation of the claimant's functional abilities, and is best supported by the evidentiary record. Other opinions–for instance, [Dr. Leder's in the Physical Assessment]–are not as well corroborated in the record, . . ." [AR 22]

The ALJ's treatment of Dr. Leder's opinion is defective for the same reasons as his treatment of Dr. Seidel's opinion: While it is apparent he discounted Dr. Leder's Physical Assessment, what weight, if any, he accorded that opinion is conspicuously absent. *See Krauser*, 638 F.3d at 1330 ("[T]he ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) . . . )." Simply stating that the opinion "lacks support" is not enough, as it is not sufficiently specific to make clear to me whether the ALJ gave it some, little, or no weight. *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *5); *see also Robinson*, 366 F.3d at 1083; *c.f.*, *Krauser*, 638 F.3d at 1331 ("[T]he ALJ's assessment of Dr. Lambert's opinion is patently inadequate for the distinct reason that it ends halfway through the required two-step analysis: the ALJ simply concluded that "Dr. Lambert's opinion ... cannot be given controlling weight" and then *said no more about it.*"). And again, if he rejected Dr. Leder's opinion, "he should have contacted [Dr. Leder] for clarification of his opinion before rejecting it," similar to how he followed-up with Dr. Qutub. *See Robinson*, 366 F.3d at 1084. The fact that the ALJ's Step Two

determination includes those impairments which Dr. Leder detailed in the Physical Assessment also clouds whether the ALJ rejected Dr. Leder's opinion.

These errors raise a broader concern: it is dubious whether the ALJ employed the requisite framework for assessing Dr. Seidel's and Dr. Leder's opinions. While the ALJ states that he "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSR 96-2p, 96-5p, 96-6p, and 06-3p," [AR 15] there is no mention of controlling weight or non-controlling weight, the two-step analysis, or the factors for weighing a treating source opinion in the context of assessing Dr. Seidel's or Dr. Leder's opinion.

Accordingly, because the ALJ's decision is not sufficiently specific to make clear to me the weight he gave to Dr. Seidel's and Dr. Leder's opinions and the reasons for the weight accorded to Dr. Seidel's opinion, I must remand. *See Watkins*, 350 F.3d at 1300. On remand, I urge the ALJ to lucidly demonstrate that he is assiduously applying the framework delineated above when evaluating Dr. Seidel's and Dr. Leder's opinions. My conclusion should not be construed as countenancing or condemning the weight that the ALJ verily placed upon those opinions or on his ultimate decision that Plaintiff is not disabled. Instead, my conclusion is that the ALJ has not demonstrated that he followed the prescribed process for evaluating those opinions and, consequently, for arriving at his ultimate decision.

**B**

As stated, Plaintiff submits four issues on appeal. Part VI.A, *supra*, addressed the first. The second is that the ALJ erred at Step Three by not finding that, based upon Dr. Seidel's records and opinion, Plaintiff was presumptively disabled due to her PTSD. The third is that the Appeals Council failed to review the entire record and remand. She specifically contends that the Appeals Council

failed to consider the additional 455 pages of her treatment records with Dr. Seidel from 2001-2007 that she submitted to it. The fourth and final is that the RFC the ALJ found is not supported by substantial evidence. For the reasons below, because I am reversing and remanding on the basis of Plaintiff's first issue on appeal, I do not reach these three issues.

I do not reach her third claim because it is moot. The case is being remanded, and those additional 455 pages of 2001-2007 treatment records from Dr. Seidel are now part of the record that will be before the ALJ on remand and should be considered. [*See* AR 1,6 ("In looking at your case, we considered . . . the additional evidence listed on the enclosed Order of Appeals Council," which included those treatment records); AR 6 ("The Appeals Council has received additional evidence, *which it is making part of the record*. That evidence consists of the following exhibits: . . . Exhibit 27 F – Medical records dated from November 6, 2001 through August 30, 2007 from Jason Seidel, Psy.D.")]; *see Martinez v. Barnhart*, 444 F.3d 1201, 1207 (10th Cir. 2006) ("Here, the Appeals Council did not specify whether Dr. Olivares' treatment records qualified as new, material, and chronologically relevant. It did, however, state that the treatment records were being made a part of the record. We interpret this statement as an implicit determination Mr. Martinez had submitted qualifying new evidence for consideration."); *Hamlin*, 365 F.3d at 1215 ("[E]ven if a doctor's medical observations regarding a claimant's allegations of disability date from earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history *and should be considered by the ALJ*.") (emphasis added); 20 C.F.R. § 404.1520(a)(3) ("Evidence considered. We will consider all evidence in your case record when we make a determination or decision whether you are disabled."); *see also* 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only

where it relates to the *period on or before the date of the administrative law judge hearing decision*. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period *on or before the date of the administrative law judge hearing decision. . . .*") (emphases added).

I also do not reach her second issue. For one, the ALJ's determination at Step 3 turns on the weight he placed upon Dr. Seidel's and Dr. Winfrey's opinions. Put differently, whether the ALJ's determination at Step 3 is supported by substantial evidence would involved examining whether the weight he assigned to Dr. Seidel's opinion is supported by substantial evidence. But I concluded that the weight and the reasons for it are opaque. I cannot decide whether a particular determination is supported by substantial evidence if I am unsure what that determination actually was. Additionally, the ALJ's assessment of Dr. Seidel's opinion may change in light of the additional treatment records from Dr. Seidel that are now part of the record and will be before the ALJ in the remand proceeding. *See Robinson*, 366 F.3d at 1085 ("As noted above, we agree with claimant's fourth claim of error: that the ALJ failed to make the requisite inquiries and findings before concluding that claimant was not compliant with her prescribed treatment. We will not reach the remaining issues raised by claimant because they may be affected by the ALJ's resolution of this case on remand; the ALJ's failure to evaluate properly the treating physician's opinion undermines his assessment of claimant's nonexertional limitations, and, therefore, the vocational expert's assessment of plaintiff's ability to return to her past relevant work."); *see also* 20 C.F.R. § 404.1520(a)(3). This means that his Step 3 determination may change.

I likewise do not reach her fourth issue for these reasons. The ALJ's RFC determination depends upon the weight that the ALJ assigned to Dr. Seidel's and Dr. Leder's opinions as treating

sources, as well as the weight he gave to non-treating sources Dr. Winfrey and Dr. Qutub. [*See* AR 14-22] The absence of weights assigned to Dr. Seidel's and Dr. Leder's opinions precludes me from evaluating whether those weights are supported by substantial evidence. I thus cannot determine whether the RFC is supported by substantial evidence. Moreover, as previously stated, Dr. Seidel's treatment records from 2001-2007 may affect the weight the ALJ places upon Dr. Seidel's opinion on remand. *See Robinson*, 366 F.3d at 1085. Consequently, his RFC finding may be affected too.

## VII. Conclusion

For the foregoing reasons, I REVERSE the Commissioner's final order and REMAND the matter to the Commissioner for further proceedings consistent with this order and judgment.

Dated: October __24__, 2012, in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock  
LEWIS T. BABCOCK, JUDGE